IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior District Judge Richard P. Matsch

Civil Action No.  03-cv-02341-RPM

LEGACY MANUFACTURING, LLC,

             Plaintiff,

v.

STEVE BODEN,
DANIEL W. LOYER, and
MVM PRODUCTS, LLC,

             Defendants.
_____

FINDINGS, CONCLUSIONS AND ORDER
_____

        After trial limited to the questions of liability on the plaintiff's complaint and the

defendants' counterclaims, pursuant to the Pretrial Order of November 4, 2005, the

Court now makes the following findings of fact and conclusions of law.

        The plaintiff, Legacy Manufacturing, LLC, ("Legacy") is a Colorado limited

liability company manufacturing inkjet cartridges for printers at a plant in Nogales,

Mexico.  Charles Duke was president of Legacy during the relevant time and was

also an owner and a manager of the company.  MVM Products, LLC, ("MVM") is a

California limited liability company with its principal place of business in California.

The individual defendants Steve Boden ("Boden") and Daniel W. Loyer ("Loyer") are

citizens of California.  This civil action was originally filed in the District Court, City

and County of Denver, Colorado, and removed to this court, which has subject

1

matter jurisdiction under 28 U.S.C. § 1331 for claims and counterclaims under federal trademark law and pursuant to 28 U.S.C. § 1332 for all other claims and counterclaims.

MVM has been in the inkjet cartridge and printer supply business since 1995, primarily acting as a reseller of inkjet cartridges and printer supplies to retailers with some direct sales to the public over the Internet.  MVM also sells refill kits which it assembles from constituent parts but it is not a manufacturer of inkjet cartridges. During the relevant time MVM made sales through manufacturers' representatives as independent contractors under Sales Agency Agreements, an example of which is Defendant's Exhibit A-5, an agreement with TAK Marketing, Inc.  Those sales representatives also sold other product lines.

Loyer has been president of MVM and Boden has been employed to handle marketing and sales efforts for that company.  Before December, 1999, MVM sold cartridges manufactured abroad by InkTech, using the brand name Universal Inkjet Cartridges.  When InkTech decided to open its own sales office in the United States and to develop more distributors, MVM began buying product from Legacy for resale in January, 2000.

MVM's sales of Legacy products grew over time.  Legacy did not put its own name on the product delivered to MVM for shipment to its customers.  Some shipments went directly from Legacy to MVM customers but Legacy was not identified as the manufacturer.  Some of the cartridges were generic with no indication of any manufacturer and others used labels designed and supplied by

2

MVM using the Universal Inkjet Cartridges name and another brand name, 24-7 Direct.  Legacy also manufactured and sold private label products directly to its customers who were in competition with MVM's customers.

During 2002, MVM developed World's Best Inkjet Cartridge ("World's Best") as a trademark and used it on cartridges made by Legacy.  MVM registered that trademark for ink jet cartridges on October 15, 2002.  Plaintiff's Exhibit 136.  MVM provided Legacy with labeling, retail boxes and dies used to make the plastic clamshells used in retail packaging of the World's Best cartridges.

In early 2003, MVM was ordering inkjet cartridges exclusively from Legacy and all of MVM's sales to retailers were sales of cartridges manufactured by Legacy. Legacy did not then have any outside sales force.  It continued to manufacture products for private label customers, including NCR, Nu-Kote and others.

Before 2003, because Legacy was careful not to be seen as competing with its direct sale customers, it did not use the Legacy name on any of its products. Boden and Loyer  made strenuous efforts to sell World's Best cartridges to such large retailers as Wal-Mart, Costco and Best Buy.  As early as January, 2001, Loyer and Boden had suggested to Duke that MVM and Legacy form a joint venture to be more competitive in the marketplace and be in a better position to sell to such large retailers as Rite Aid and Cosco.  Duke rejected the suggestion.

By January, 2003, MVM was in financial distress.  It owed Legacy approximately $138,000 for product that had been sold and MVM was unable to pay rent and other expenses of doing business out of its California office.  Loyer sought

assistance from Duke to help MVM survive and there began a long series of

communications and negotiations which never resulted in any formal agreement.

The parties' respective interpretations of these communications and succeeding

conduct are the subject of this lawsuit.

Under date of January 7, 2003, Duke sent a letter to an attorney, Tom List,

outlining the problems of MVM and the interests of the parties in developing a new

business relationship.  Boden and Loyer were copied on that letter, Defendants'

Exhibit M-1.  Two paragraphs from that letter are of considerable importance to

understanding this dispute.  These are as follows:

> Obviously, as I am copying them on this e-mail, our relationship is a good
> one.  In fact there are several very strong reasons to have the activities of Dan
> and Steve continue to the benefit of Legacy and them.  They have the strong
> existing and prospective customers that Legacy has and will produce the
> product for.  They have a brand, *World's Best,* that is in the market.  Legacy
> has, coincidentally, been moving to sell up one channel of distribution as part
> of its current business plan and needs to sell under a brand that is not
> "Legacy".  They are also working on product innovations that are important for
> Legacy to pursue as a part of its leadership in this area.
>
> I would like to hire Dan and Steve as independent contractors and/or sales
> reps through their firm, Bolo Management Corp., and pay them a commission
> for sales.  I would like to "purchase" the right to the *World's Best* brand for
> amounts of A/R written off.  I would like to offer an option program for Dan and
> Steve (or Bolo) to purchase a portion of the Legacy membership interest as
> certain performance criteria are met.  I would like to "purchase" an option on
> the new technology being patented by Dan and Steve at a price to be
> determined in the future.  I would like to be able to directly hire Dan and Steve
> at some desirable point in the future.  I would like all existing and future P.O.'s
> to MVM for product produced by Legacy to be reissued or issued by the end
> customer in the name of Legacy ( which should not be a problem with the end
> customers, we believe).
>
> List responded with a series of questions (Defendant's Exhibit N-1) which

Duke answered by e-mail.

In February, 2003, Best Buy, a large retailer, issued a Request for Quote for inkjet cartridges to be sold under the Best Buy private label.  This presented a major opportunity to provide a complete line of compatible inkjet cartridges and re-manufactured inkjet cartridges.  Because one of the criteria in the Request for  Quote was Best Buy's access to the manufacturer, Loyer and Boden suggested to Duke that MVM and Legacy prepare a joint response with an agreement that Legacy would make its normal manufacturing profit and that Legacy and MVM would then divide any additional profits equally.  Duke agreed and a joint response was submitted in January, 2003, but the effort failed.

MVM had, in 2002, obtained orders from Wal-Mart and Sam's Club.  MVM had also begun to obtain orders from NEAMCO, a business-to-business wholesaler, in January, 2003, and had obtained a vendor agreement with Duckwall, a large retailer in rural communities.  Access to these large retailers was through the sales representatives under contract with MVM.  Thomas Kennon, doing business as Tak Marketing, had access to Wal-Mart and Sam's Club such that Mr. Kennon lived near the Wal-Mart corporate headquarters in Bentonville, Arkansas.

While sales were being made in 2003, to the mutual benefit of MVM and Legacy, there was no formal agreement defining their relationship.  Communications back and forth continued between Duke and Loyer.

Legacy contends that Boden and Loyer became employees of Legacy when they were put on the payroll in June, 2003.  They signed the usual forms, W-4 and

others, given to them by ADP, Legacy's payroll administrator.  They were also provided with Legacy credit cards and were offered health insurance and related benefits as other employees of Legacy.  Legacy also claims that MVM agreed to transfer the trademark in exchange for the forgiveness of its indebtedness to Legacy, and that MVM, in consideration for Loyer and Boden becoming equity members of Legacy, valued together at $150,000, agreed to transfer lists of customers, update vendor agreements and modify MVM's sales representative agreements to change from MVM to Legacy.

The testimony of Duke and Loyer is conflicting and the evidentiary record, taken as a whole, does not support the plaintiff's contentions as to respective legal positions of the parties.  What has been shown is a kind of amorphous association of Loyer, Boden and Duke who continued to conduct business without establishing the duties and obligations that are cognizable in court.

The dispute in this case results from the difference in the objectives the respective parties sought to achieve from their relationship, beginning in early 2003. Duke wanted to change Legacy's business model to sell its manufactured products directly to retailers, using Legacy's own sales force and eliminating resellers or any other form of intermediary.  At the same time, Legacy did not want to be seen as competing with those customers for whom it was making products under private label brands.  Accordingly, Legacy did not want to market products under its own name.  Duke also recognized that the *World's Best* name had achieved market recognition and that MVM had obtained access to major retailers through its sales

representatives using that brand.  As noted in his letter to his attorney, Duke wanted to acquire MVM's business without exposing Legacy to MVM's liabilities as may be the result of a purchase of MVM.

Loyer and Boden saw that MVM was in financial peril.  They wished to preserve that entity, in which there were other investors, by using Legacy as an engine for recovery without losing MVM as a business entity and without making it entirely dependent upon Legacy.

The difference between the goals of the parties is illustrated clearly by comparing two exhibits.  On February 13, 2003, Loyer, in responding to documents received from Legacy's attorney, sent Duke a letter stressing the strength of MVM and including the following paragraphs:

### *Legacy write-off of MVM Products' A/R*

If we consider the costs involved in the write-off of monies owed to Legacy, that cost basis is roughly $48,825 or 35% of the $139,000 invoiced last year. Currently, MVM Products has delivered to Legacy a customer and their first order of $216,000.  It is fully expected that NEAMCO will do roughly $1,000,000 with Legacy in 2003.  At current cost representations made by Legacy, the first order generated $90,000 in profit (roughly 42%), and future orders will generate roughly $400,000 in profit.  I believe our debt to Legacy is paid.

### *World's Best ® License*

Legacy is interested in a license to use World's Best ® brand name.  This brand has become recognized in the retail market in the US and Mexico. MVM Products would be interested in granting an irrevocable exclusive license to Legacy in Mexico and selected accounts in the US in return for compensation as follows:

!       10% royalty payment on all sales of product sold under the brand name "World's Best ®"

> $78,000 draw on royalties to be paid at a rate of $13,000 per month
> starting February 1, 2003.  This draw would reduce the percentage
> royalty payment due by a like amount.
>
> Defendants' Exhibit P-5.

In response, Duke sent a letter by e-mail on February 19, 2003, containing

this conclusion:

> I have been reflecting on the direction of your discussions about the
> relationship with Legacy and, although I believe that it is the weaker
> alternative for both of us, I am convinced that you would rather work alone as
> MVM than together as Legacy.  I think it is important, in this light, to make
> clear what Legacy would expect from this relationship, which can and should
> be a very strong one, going forward.
>
> Defendants' Exhibit P-1.

Following that paragraph, Duke asked for immediate payment of amounts owing to

Legacy from MVM and set the terms of future sales in a vendor/customer

relationship between the two companies.

Loyer then sent to Duke a list of points to be discussed at a meeting as

follows:

> Here are the points I think we need to nail down:
>
> ! Purchase of World's Best ® brand
> " $139,000 A/R
> " $13,000 for 3 months (we didn't touch on this today)
> ! MVM gets to sell the World's Best ® brand product
> " Irrevocable license
> " Irrevocable, exclusive license for the new product line
> being developed
> ! NEAMCO stays with Legacy (don't confuse the customer)
> " MVM gets paid commissions on sales
> " Rep commission is paid before any split and reduces
> principal amount on which to base commission/split
> calculation
> ! Pricing for business between MVM and Legacy
> ! Partnership approaches to appropriate customers

       "         Each should have an agreement (maybe a general paper with specifics on a separate sheet)

Defendants' Exhibit R-5.

As previously noted, NEAMCO was an MVM customer for the World's Best Cartridges manufactured by Legacy.  On January 29, 2003, Duke and Loyer agreed to send a letter to NEAMCO to change purchase orders to place them directly with Legacy and explaining the reasons in the following paragraphs.

> We are writing to clear up the confusion caused by our latest contacts with you.  At this time, MVM Products and Legacy are working in concert with one another to better penetrate the inkjet market.  This collaboration has very positive effects for our customer base in that it enables us to more aggressively price the product line.
> ....
>
> MVM Products and all of its personnel will be very involved in the sales and marketing function of Legacy as well as certain engineering aspects.  Additionally, Bob Hickey continues to represent the product line as an independent sales rep.

Defendants' Exhibit K-4.

The letterhead included the World's Best logo, a Legacy logo and the MVM Products name and address.  It was signed by both Loyer as president of MVM and Duke as president of Legacy Manufacturing.

This letter illustrates the fact that the failure of the parties to formalize their business relationship did not stop their ongoing efforts to make and sell Legacy's products, using the World's Best mark, but did cause confusion in the market.

The meeting referred to in Defendants' Exhibit R-5 was held and the parties came away from it with different understandings of their relationship.

Loyer and Boden were placed on the Legacy payroll at the beginning of June,

9

2003.  Shortly thereafter, on June 5, 2003, Loyer wrote a letter to Costco, on Legacy letterhead, signing as Senior Vice President-Marketing for Legacy, advising Costco that the vendor agreement would be modified to change to Legacy from MVM and that he and Boden were working directly for Legacy and that the World's Best brand had been transferred to Legacy.  Plaintiff's Exhibit 89.  At about the same time, Boden and Loyer were made members of the Legacy LLC and Loyer became a manager.

A meeting of Legacy members was held in Denver on July 8, 2003, attended by Loyer and Boden as well as Duke, Gonzalo Mimiaga (in charge of the Legacy manufacturing plant), and other members and employees of Legacy.  The purpose of that meeting was to outline a business plan for the second half of 2003 and Loyer participated giving his projections of potential sales.  The meeting also included presentation of a table of organization with Loyer shown as senior vice president for sales and Boden under him as director of retail sales.  Plaintiff's Exhibit 111.

The parties dispute the consideration given for providing an equity position to Boden and Loyer.  Duke contends that it was in exchange for the transfer of customer accounts and the related sales representative agreements to Legacy.  The defendants deny that the transfer of the sales representative agreements was a part of the consideration and contend that such transfer of account representatives would require renegotiation with them.  MVM did not have unilateral authority to make the same persons sales representatives of Legacy.     There is support for Duke's testimony in an e-mail from Boden to Duke and Loyer, dated September 26, 2003,

telling Duke that Boden is in the process of modifying the sales representative agreements for renegotiation and signatures under the Legacy name.  Plaintiff's Exhibit 66.  The modification did not happen and Boden testified that given that there had been ongoing negotiations since January regarding the relationship between the two companies and that no written agreement had resulted, he "was tired of being asked to get something done that I only thought would be done once we had come to a written agreement and written terms."  Transcript 550.

As previously noted, MVM had obtained a certificate of registration for the World's Best Inkjet Cartridge trademark from the Patent and Trademark Office, effective October 15, 2002.  MVM did not formally assign that trademark in the PTO records but Loyer gave Duke the original of the certificate of registration.  The dispute between the parties with respect to this matter centers on whether MVM would have the right to continue to use the trademark under a license from Legacy after the transfer was made.  The record shows communications back and forth on this issue with a continuing disagreement about whether such a license would be revocable or irrevocable.  The issue was never resolved.

The defendants did show the sale of the trademark on their 2002 state and federal income tax returns, reporting a net gain of $122,572 on the transaction and Loyer, Boden and other members of MVM paid taxes on that gain.  The Legacy ledger shows salary payments to Loyer, Boden and Deborah Banuelos (a clerical assistant to Loyer and Boden) for the months of June, July, August and September, 2003.  Defendants' Exhibit N-8.  The ADP earnings statements to Loyer, Plaintiff's

11

Exhibits 102, 103 and 104, show salary with the usual payroll deductions for Loyer for June, July and August, 2003.  Sherry Snead, the bookkeeper for Legacy, sent termination notices for Loyer, Boden and Banuelos to ADP, reflecting hire dates of 6-03 and last day worked as September 30, 2003, giving "job abandonment" as the reason for separation.  Defendants' Exhibits J-8, K-8 and L-8.  The notices also reflected a rate of pay of $6,335 monthly for Loyer and Boden.  That monthly salary does not correspond to the actual payments made.

Loyer and Boden worked out of the MVM California office where Debbie Banuelos also worked.  On June 19, 2003, Loyer sent an e-mail to Duke regarding "funding issues" saying that he assumed that they were at full salaries for the month and expressing the need to pay rent for June and July, a few vendors and to pay Debbie and the phone and light bills.  Defendants' Exhibit Z-5.  Loyer testified that Duke said that Legacy was having funding troubles and that Duke asked for a list of those expenses that were critical to moving forward.  The response is shown in Defendants' Exhibit B-6.

Defendants' Exhibits I-6, J-6,L-6, M-6 and O-6 are lists of expenses for July through September, 2003, sent to Duke by Loyer.  Except for I-6, these statements reflect salaries to Loyer and Boden of $6,300 and then expenses for the office, including rent, phone, etc.  In Defendants' Exhibit O-6, dated September 26, 2003, the salary amounts are different and there is this notation:

> I put the salaries in at $65,000 per year.  I am assuming that there will be no taxes or deductions as these will be paid as 1099 transactions.  If you need me to send an invoice for this amount let me know.

These statements resulted in Legacy checks directly to Loyer.  These payments of MVM expenses are inconsistent with the contention that Loyer and Boden were direct employees of Legacy.

Duke sought to resolve the ambiguities and the uncertainties in this relationship at a meeting in Las Vegas during a trade show in late September, 2003. He forwarded a proposed agenda to Loyer, by e-mail dated September 25, 2003, explaining that he was acting under some pressure from proposed investors.  The agenda was headed "Full Integration Steps of Sales Team" and outlined the things needed to be done to put everything under Legacy.  That agenda is Plaintiff's Exhibit 217.  Among the items listed were changing the representative agreements and the vendor agreements, removal of MVM's name from the phone and web site references, eliminate any payment of MVM costs by Legacy and transfer of the trademark by submission of papers to the PTO.  The meeting was held and Loyer interpreted Duke's position as wanting Boden and Loyer to discontinue MVM and serve only Legacy, which they refused to do.

Loyer and Duke next met to discuss the relationship in Nogales, Mexico, on the weekend of October 4-5, 2003, on the occasion of the wedding of Ben Lyles, Legacy's product development director.  At that time, Duke explained that Legacy was having some business problems and it was agreed that there would be no further salary payments but all compensation would be based on commissions but there was disagreement with respect to the amount of such commissions.

On the following Monday, October 6, 2003, Loyer sent an e-mail to Duke

outlining "deal points" as a result of their conversation in Nogales.  That document is Defendants' Exhibit O-3.  It described a proposal that MVM would be the exclusive contractor to manage sales and marketing for Legacy for one year with commissions of 10% to 6% based on a stair-step volume of annual sales and also providing that Legacy would pay management fees to MVM.

Duke responded by e-mail at 8:09 a.m. on October 7, commenting that there were no performance provisions; that the items discussed in Las Vegas were not mentioned and the pricing was not agreeable.  Loyer responded by e-mail at 8:19 a.m., asserting that he thought the stair-step arrangement had been agreed to and commenting that the items in Las Vegas addressed integrating the two companies but that they were now separating them for cost purposes.  Defendants' Exhibit P-3.  That is consistent with the notation on Defendants' Exhibit O-6.

Duke then sent to Loyer Defendants' Exhibit Q-3, a draft Independent National Sales Representatives Agreement, dated as of October 18, 2003, between Legacy and MVM, appointing MVM as exclusive national sales representative in the United States and Canada, with commissions at 3% of the net invoice price of Legacy's products with Legacy granting MVM use of the World's Best brand for the limited purpose of doing business for Legacy for a term of 15 months and a provision for renewal.  It also provided for termination on 90 days written notice.  That proposed agreement was not acceptable to Loyer but he did not respond to Duke.  MVM sent a purchase order to Legacy on October 15, 2003, but Duke cancelled it.  Defendants' Exhibit A-9.

14

There having been no response from Loyer, Duke wrote to him on October 22, 2003, asking what was going on, particularly with reference to a proposal to Sam's Club, Mexico, made by Thomas Kennon, the sales representative having access to that retailer, and requesting a meeting in San Clemente with Loyer and Boden "to finalize our working arrangement."  Plaintiff's Exhibit 234.  Duke had talked with Kennon on October 22, 2003, concerning Kennon's efforts to sell to Sam's Club of Mexico.  Kennon was an MVM sales representative under contract since early 2001 and he had an established relationship with Wal-Mart and Sam's Club.  On October 23, Duke sent an e-mail to Kennon after forwarding information requested by Sam's.  That e-mail, a copy of which went to Loyer, included the following paragraphs.

> I am sending you six different e-mails in addition to this e-mail.  Manuel Mimiago worked hard on putting all the information together for Sam's.
>
> As you may or may not be aware (I wasn't until last night), MVM has some second thoughts about the nature of the relationship between Legacy and MVM.  We will be working to resolve these issues in the next few days.  I believe that these issues cannot and will not affect the ultimate goal of both MVM and Legacy of making the transactions work with Sam's as it is in all of our interests to do so.
>
> So, I have forwarded these items required by Sam's for your review.  I am sure you will want to discuss this with Dan, but I hope these help.
>
> Defendants' Exhibit O-7.

Among the items sent by Duke were forms used by Wal-Mart for obtaining cost information from suppliers showing Legacy as the supplier.  Kennon declined to forward those forms, telling Duke that Kennon was MVM's agent under contract.  On October 27, 2003, Duke sent an e-mail to Kennon which Kennon in turn sent to Boden.  That message was as follows:

I am following up on the paperwork I sent you last week.  I sent you information on Legacy, its products, our rights/ownership of the "World's Best" brand, and a proposed new representative contract.  I have left several messages, but thought I would follow on with this e-mail.  As you know, we have made a very attractive offer to Sam's Mexico that has time limitations and I think it best if we move forward with this.  I also believe that Sam's Domestic is near a decision point with their program using our BC13,5,6 cross compatible that they have been testing.

As I understand it, you are reviewing your situation vis-a-vis MVM Products.  As you saw from the material I sent you last week, they had made commitments to re-write their contracts with Legacy.  As you have told me, MVM also indicated to you that Legacy was just a company assembling product that was designed by and owned by MVM.  I have sent you information indicating that this is not the case and that this is a serious misrepresentation.

I believe that we are all best served by moving forward with a direct relationship with TAK Marketing and you and serving Sam's and Wal-Mart with the product direct from the manufacturer as I understand they have been negotiating with you.  I would like to offer to come to visit you both to become better acquainted and to assist in any way that is sensible with Sam's and Wal-Mart.

                                                          Plaintiff's Exhibit 173.

Duke followed that e-mail with telephone conversations attempting to get Kennon to work directly for Legacy, offering incentives including a golf cart.  Kennon refused.

These contacts Duke made with Kennon resulted in a complete rupture of the relationship between the plaintiff and defendants.  Cease and desist letters were exchanged through attorneys.

The negotiations with Sam's Club Mexico were for a reorder with a value of approximately $400,000 that had been the subject of negotiations before November.  Carlos Osada was the buyer representative for Sam's Club Mexico and on November 4, 2003, Loyer sent to Osada an e-mail which included the following two

paragraphs.

> It has come to my attention that personnel from Legacy Manufacturing have contacted you saying that MVM Products is changing its name and vendor number.  This is absolutely not true!  Please let me be very clear.  Legacy Manufacturing is not part of nor ever has been part of MVM Products.  Manuel Mimiaga and Charles Duke are not nor have they ever been employees or representatives of MVM Products.  MVM is the vendor of record of these inkjet products.  We are the registered trademark, dress and UPC holder.  Legacy is merely one of several contract manufacturers that MVM Products used to provide the best possible inkjet products to the market.

> It is unfortunate, but it appears Legacy is trying to usurp MVM's position in the market by providing misleading information to our customers.  MVM Products is a company Sam's Club has been doing business with for more than a year on these inkjet products.  As president of MVM Products, I have been in direct contact with you and your team regarding this opportunity.  And, it is MVM Products that has offered to provide the write down funds on this order.  MVM is looking forward to supplying these products to Sam's Club and Wal-Mart for a very long time.
>
> Plaintiff's Exhibit 140.

Also on November 5, 2003, Loyer sent to Kennon a draft of a letter to be sent to Sam's Club concerning a potential problem with Legacy cartridges that had been previously sent to Sam's Club for testing.  Plaintiff's Exhibit 14.  On November 14, 2003, Loyer sent to Kennon an e-mail, asking Kennon to contact the Sam's Club people to tell them that there was a solution found to the problem and new samples would be sent.  Plaintiff's Exhibit 16.

The proposed sale to Sam's Club, Mexico, on the reorder was for Legacy's product.  Mr. Osada conducted a meeting in Mexico City with Loyer, Kennon and Manuel Mimiaga of Legacy to resolve the confusion.  The sale that had been discussed was never made by either MVM or Legacy.

The samples supplied to Sam's Club for testing which were then picked up by

17

Kennon were made by Legacy and the new samples which Kennon provided were manufactured by Town Sky, a manufacturer with whom MVM did business after Legacy.  Kennon did not identify either manufacturer to the Sam's Club representative.

On October 25, 2003, Boden sent an e-mail to Brad Meyer, an MVM sales representative for Duckwall Stores saying that "Legacy Manufacturing has also been terminated from our approval list of contract manufacturers for cause."  Plaintiff's Exhibit 123.  Another e-mail was sent to Meyer by Boden on December 5, 2003, asking for a recap of a conversation Meyer had with Duke and saying, "you are not the only rep he has tried to hijack since late October."  Plaintiff's Exhibit 86.  On November 18, 2003, Boden sent an e-mail to Robert Wax, an owner of MVM, saying that "Legacy's owners have turned out to be thieves."  Plaintiff's Exhibit 87.

I Talon manufactures electronic assemblies referred to as "chips" for cartridges sold for use in Epson equipment.  MVM purchased such chips from I Talon and then provided them to Legacy for inkjet cartridges.  When the relationship became strained in the fall of 2003, Loyer instructed I Talon's president, Gary Whitaker, that I Talon should not sell chips directly to Legacy.  Loyer sought to control the marketing of those chips because MVM had developed the chips.  I Talon refused Legacy's orders for the chips.

This lawsuit was filed in the District Court, City and County of Denver, Colorado, on November 10, 2003, and it was removed to this court by the

18

defendants on November 24, 2003.  Legacy sold and shipped to Wal-Mart Mexico approximately $245,000 worth of product bearing the World's Best Inkjet Cartridge trademark after this case was initiated and it made sales to other customers with the trademark on the product, all as shown in Defendants' Exhibit Z-8.

In January, 2004, Legacy terminated Loyer and Boden as members of the limited liability company and did not pay them anything for their combined 5% interest.  In a letter dated March 15, 2004, from Duke to Loyer and Boden, Duke said that Legacy was electing to "puchase" their membership interests "for the amount of your contribution, which is zero dollars ($0.00)."  Defendants' Exhibit A-7.  In that same letter Duke wrote that "in fact, neither of you actually became members of the company since you failed to provide the agreed upon consideration and contribution prerequisite to acquiring such membership interest."  Defendants' Exhibit A-7.

## CONCLUSIONS OF LAW

The evident anomalies in the foregoing findings of fact are reflected in the claims and counterclaims of the parties in this case.  Legacy seeks recovery from Boden and Loyer individually on claims of breach of fiduciary duty of loyalty as employees of Legacy and as members of the Legacy LLC, adding also that Loyer was a manager.  The employee relationship would at best have been from the beginning of June, 2003, to September 30, 2003, when notice of separation was sent to ADP.  There is no written employment agreement and the legal relationship of employer and employee is not conclusively established by placement on the payroll and the tax treatment of compensation.  An essential element of this legal

19

relationship is the employer's authority to control the activities of the employee.  The evidence in this case does not prove that element.  There was never a meeting of the minds as to the terms and conditions of any employment.  Loyer and Boden did not change their sales activities from that which they were doing as MVM before June, 2003, with respect to Legacy's products.  There is no evidence that Duke or others from Legacy directed the individual defendants.

There is no evidence that during the time that they were on the payroll, Loyer or Boden sought to sell any products made by other manufacturers than Legacy. The plaintiff attempted to suggest that Boden was seeking to transfer business to L. B. Imaging, a partnership of the wives of Boden and Loyer.  The plaintiff suggests that at a meeting with Staples, a prospective large customer, Boden was trying to obtain that customer for the partnership.  There is nothing in the evidence to contradict Boden's testimony that he developed a trade name in California, using L. B. Imaging and showing the wives as partners, solely to expand opportunities for sales by appealing to prospective customers who gave preferential treatment to women-owned enterprises and that the supposed partnership never did any business.  Moreover, there is nothing to suggest that the product involved in the Staples meeting was other than what Legacy manufactured.

All that we have here are representations made by Boden and Loyer with respect to the relationship between MVM, themselves and Legacy as different from what Duke believed they had all agreed on.  It is somewhat ironic that among the breaches complained of by Legacy is that no Legacy personnel were in attendance

20

at sales meetings conducted by Boden and Loyer while at the same time contending

that they were Legacy personnel.  Additionally, there has been no showing of what

other persons should have been present on behalf of Legacy.            What we

have then is that before the complete rupture of the relationship, Loyer and Boden

were attempting to maintain MVM as a viable business entity contrary to their

informal agreements to put forward Legacy and promote its identification in the

market.  Yet, for some customers, Legacy still wanted to be hidden to enable it to

continue to manufacture for private labels with whom they did not wish to be seen as

competitors.  It was not until the late fall of 2003 that the defendants actually became

competitors with Legacy when they began efforts to sell products manufactured by

others.

What has been said about the role of these individuals as employees is also

applicable to their positions as members of the limited liability company and to Loyer

as a manager.  It is telling that when they were "expelled" from membership by Duke,

he, as previously noted, said that the value of their interests was zero and expressly

denied that they ever were members.

The plaintiff includes MVM as a defendant on a claim for breach of contract

based on the failure to assign the trademark in exchange for elimination of past-due

debt and the failure to transfer customer accounts and related sales representative

agreements in exchange for the equity interests in the plaintiff.  The first part of this

claim for damages for failure to transfer the trademark is inconsistent with the

plaintiff's position that Legacy had the ownership of the trademark and that the

defendants infringed that trademark by their use of it, as alleged in the unfair competition count and the trademark infringement count of the complaint (Counts 3 and 6). While alternative pleading is appropriate before trial, these inconsistent positions after the trial are not sustainable. Thus the plaintiff cannot recover for the claims based on unfair competition and infringement of a trademark and simultaneously say that the transfer was not made resulting in a breach of a contract. The plaintiff's difficulty arises from the uncertainty about what these parties actually agreed. Throughout the exchange of communications regarding the nature of the relationship, the defendants were seeking a license to use the trademark and there was an ongoing dispute with respect to the terms of such a license. No agreement was ever reached.

MVM did get the benefit of relief from its liability to Legacy for the account payable for purchased product and the defendants have suggested that some restitutionary relief may be in order but, as will be seen, there are offsetting claims. Before November, 2003, there is no evidence that the defendants used the World's Best mark to identify any product not manufactured by Legacy. The purpose of a trademark is to identify the source of a product and again the plaintiff's difficulty is that it had conflicting interests in being recognized as the manufacturer when it was also making products for other competitors in the inkjet printer market.

The parties have a legal dispute about the enforceability of any agreement to transfer the trademark because it would, in defendants' view, constitute an agreement "in gross" prohibited by the Trademark Act. That legal dispute is

22

irrelevant.  It is established law that it is not necessary that physical assets be transferred with a trademark; it is sufficient if it is a transfer associated with the transfer of the goodwill that is attached to the trademark.  Here, identification of ownership of the goodwill associated with the World's Best mark before June, 2003, is problematic.  The goodwill may be the quality of the product which is that of the manufacturer but goodwill is also associated with the trade dress packaging and marketing methods which was the business of MVM when it registered the trademark and up to the time that the parties attempted to develop a joint relationship in early 2003.  There is really no basis for separating out an assignment of the trademark from all of the other aspects of the parties' ongoing activities prior to the termination of those activities.

For the first nine months of 2003 the parties benefitted from their respective efforts to make and sell ink jet cartridges using the World's Best brand but by the end of the year their inability to reach an agreement on their legal relationship was mutually destructive.  It has been conceded that there is no present value to the World's Best trademark.  The question of present ownership of that trademark is therefore moot.  The competing claim and counterclaim for infringement and unfair competition like the other claims and counterclaims in this case that depend upon proof of identifiable rights and obligations have not been proven by either side.  This is a case in which the Court is justified in leaving the parties where it found them, mired in a quandary of their own making.

Legacy has asserted separate claims for defamation in the form of business

libel *per se,* based on communications both pleaded in the complaint and not

pleaded because they occurred after the complaint was filed.  Accepting the

plaintiff's argument that the Court should consider the claims not pleaded and

conform the pleadings to the evidence, the Court concludes that the plaintiff has

failed to prove the essential elements of these claims because they do not on their

face contain sufficient defamatory words and because the plaintiff has failed to

overcome the defense of qualified privilege.

Exhibit 14 is an e-mail from Loyer to Kennon dated November 5, 2003,

containing a draft of a proposed letter to be sent to Sam's Club which reads:

> I am writing to advise you of a potential problem with the cartridges that you
> have been testing.  We have experienced a performance issue in the BCI-3
> cartridge from our contract manufacturer.  It does not fit correctly in the newer
> Canon printheads (the F50/F80 and i550/i560 series of printers).  This causes
> the cartridge not to feed properly through the life of the cartridge.  The print
> degrades as the cartridge becomes depleted.

Exhibit 14 itself contains no reference to or mention of Legacy as the

manufacturer or source of the product discussed in the e-mail, and Legacy presented

no evidence that the e-mail was sent, forwarded or published to anyone other than

Kennon and Boden.  The term "contract manufacturer" is not defamatory *per se* as a

matter of law, even if its recipient understood the term to refer to Legacy.

Because the statements in Exhibit 14 were made to a person who shared a

common interest in the subject matter with Defendants, Legacy must prove that the

statement was made by Loyer with either knowledge of its falsity or reckless

disregard for its truth or falsity.  Legacy has not met this burden here.

On October 8, 2003, Loyer sent an e-mail to Duke and others at Legacy advising that the BCI-3 cartridge degraded in Steve Messmer's printer again, exhibiting the same problems as before, which were the spreading of the ink on the paper and missing nozzle prints as if they were clogged (Plaintiff's Exhibit 128).  At the time Mr. Loyer sent Mr. Kennon Exhibit 14, he was not convinced that there was no fit problem with the BCI-3 cartridge manufactured by Legacy.

Mr. Kennon did not tell the buyer at Sam's Club when he dropped off the first sample that it was a cartridge manufactured by Legacy.  There was no evidence that the e-mail was republished to anyone at Sam's Club or to anyone else and Legacy presented no evidence that anyone at Sam's Club either received the e-mail or its content, or understood that Legacy was the manufacturer of the cartridge samples.

**Exhibit 16.**  Exhibit 16 is an e-mail from Boden to Kennon dated November 5, 2003, after the complaint in this case was filed.  Exhibit 16 states:

> Please contact Robby and Debbie to let them know that we have determined that there is a problem with the ink in the BCI-3 black cartridges he is testing. We have found a solution and would like to provide other samples for an additional test.
>
> The problem occurs in some of the printers including i550, i560, F50 and F70. After a period of use, the quality of the output starts to deteriorate.  We have determined that it is caused by build-up on the print head nozzles.  This build up is the result of the ink that is used by the contract manufacturer that we just replaced about 30 days ago.

There is no mention of Legacy in this e-mail, by name or otherwise, as the manufacturer or source of the product discussed in the e-mail.  As with Exhibit 14, Legacy presented no evidence that the e-mail was sent, forwarded or published to

anyone other than Kennon.  As previously found, the term "contract manufacturer" is not defamatory *per se* as a matter of law.

Because this e-mail to Kennon is therefore protected by the common interest privilege, Legacy must prove that Boden made the alleged statement with either knowledge of its falsity or reckless disregard for its truth or falsity.  Legacy has failed to meet this burden.  Boden testified that he had no doubts about the truth of his statement about the problem with the ink when he sent Exhibit 16 to Mr. Kennon, that he believed it to be true, and that he was not aware of any information that suggested that his statement about the ink was not true.

Exhibit 16 did not mention Legacy by name or otherwise identify it as the source of the cartridge samples, and Kennon did not tell the buyer at Sam's Club that the first sample cartridge was manufactured by Legacy.  There was no evidence that Exhibit 16 was republished to anyone at Sam's Club or to anyone else and Legacy presented no evidence that anyone at Sam's Club either received the e-mail or its content, or understood that Legacy was the manufacturer of the cartridge samples.

**Exhibit 86**.  Exhibit 86 is an e-mail from Boden to Brad Meyer, another of MVM's sales representatives, dated December 5, 2003, after the complaint was filed in this case.  Like Exhibits 14 and 16, this is another e-mail that was published to only one person.  The portion of this e-mail alleged by Legacy to be defamatory is:

> Will you take a few minutes and e-mail me a recap of your conversation with Duke today.  You are not the only rep he has tried to highjack since late October.

26

As with Defendants' communications to Kennon, the statement in Exhibit 86 is also protected by the privilege accorded to communications to those with a common interest in the subject matter.  Like Kennon, Meyer was MVM's sales representative under contract with MVM and therefore this communication is qualifiedly privileged. Legacy must therefore prove that Boden made the statement in Exhibit 86 either with knowledge of its falsity or with reckless disregard for its truth or falsity.  Under the facts as established at trial, Legacy cannot meet this burden here.

Boden testified that he used the term "highjack" to characterize Mr. Duke's attempt to convince Kennon to work directly for Legacy.  Although used in a slang or colloquial sense in Exhibit 86, "hijack" has a commonly understood meaning of to commandeer without authority.  This is fair comment on Duke's efforts to persuade Mr. Kennon to discontinue his representation of MVM and represent Legacy instead.

**Exhibit 87.**  Exhibit 87 is an e-mail dated November 18, 2003, from Boden to Robert Wax, who was identified at trial as a member and owner of MVM Products, LLC.  This e-mail was sent after the complaint in this case was filed.  The allegedly libelous language is quoted here in the context of the entire paragraph in which it appears:

> The Sam's Club Mexico buyer held a meeting last Thursday in Mexico City with us and Manuel from Legacy.  We presented documentation as to our ownership of our trade marks and barcodes.  Legacy did not.  He has decided to wait until we can demonstrate that Wal-Mart will not be in the middle of any legal actions between Legacy and us.  Legacy claimed that they own the World's Best trade mark and are using our UPC barcodes, codes.  We are going to Federal Court to secure an injunction against legacy from violating Federal Trade Mark laws and trying to usurp our identity.  *Legacy's owners have turned out to be thieves.*  [Emphasis added.]

Boden testified that his purpose in sending the e-mail was to provide Wax with an update on MVM's sales efforts.  Because Wax, as an owner of MVM, has a common interest with the defendants in the subject matter of this communication, the statements in Exhibit 87 are protected by the qualified privilege accorded to communications to those with a common interest in the subject matter.   Legacy must therefore prove that Mr. Boden made the statement in Exhibit 87 either with knowledge of its falsity or with reckless disregard for its truth or falsity.  The publication is not actionable because it is clearly a statement expressing Boden's personal opinion about Legacy's owners rather than an assertion of verifiable fact or an accusation of the commission of a specific crime.  A statement of opinion is protected from liability for defamation where it does not contain a provably false factual connotation or where it cannot reasonably be interpreted as stating actual facts about the plaintiff.  Boden's statement in Exhibit 87, therefore, is actionable only if the word "thieves" can be construed as a verifiable factual statement imputing the commission of a crime to Legacy's owners.

The Court finds that the statement "Legacy's owners have turned out to be thieves" is a statement of opinion rather than an accusation of the commission of a specific crime.   Viewed in context, this statement is merely rhetorical hyperbole and cannot reasonably be viewed as an assertion that the specific crime of theft has been committed.  The statement is clearly recognizable from its context as a statement of opinion based on the facts discussed in the e-mail exchange between Boden and Wax in Exhibit 87.  These facts include the meeting in Mexico City with a

Sam's Club representative and Legacy's involvement in that meeting, Legacy's claim to the trademark in issue, Legacy's solicitation of MVM's sales representatives, and the breakdown of the parties' relationship culminating in litigation.

The communication containing this statement of opinion, moreover, was sent to only one person, an owner of MVM, and was clearly intended to provide the recipient with an account of the deterioration of the parties' relationship from Mr. Boden's point of view.  Mr. Boden testified that his reference to Legacy's owners as "thieves" in Exhibit 87 was his opinion of what was happening at the time. Accordingly, because the statement that "Legacy's owners have turned out to be thieves" is clearly a statement of opinion based on disclosed facts, it is protected for defamation by the First Amendment.

**Exhibit 123.**  Exhibit 123 is an e-mail dated October 25, 2003, from Boden to Brad Meyer, one of MVM's sales representatives.  This is yet another allegedly defamatory publication that was made to only one person.  As with other e-mails on which Legacy's defamation claims are based, not only one person, but Legacy failed to present any evidence to show that its recipient understood it to have a defamatory meaning.

The specific language in Exhibit 123 that Legacy contends is defamatory is the statement that "Legacy Manufacturing has also been terminated from our approved list of contract manufacturers for cause.  As explained above, the term "contract manufacturer" is not defamatory *per se* as a matter of law.  This leaves only the statement that Legacy was "terminated for cause" as the basis of Legacy's

defamation claim.

As with Defendants' other communications to MVM's sales representatives, the publication in Exhibit 123 is protected by the common interest privilege.  Legacy must therefore prove not only that the alleged statement was false, but also that it was made by Boden either with knowledge of its falsity or with reckless disregard for its truth or falsity.

The evidence at trial established that on October 23, 2003, Duke, on behalf of Legacy, sent Defendants a letter directing them "to cease and desist representation of all Legacy Manufacturing, LLC products" (Plaintiff's Exhibit 84).  At that point Defendants could reasonably have considered their relationship with Legacy, whatever form it may have taken, to have been terminated.  Under these circumstances, Defendants could reasonably have believed that their relationship with Legacy had been terminated "for cause," namely because Legacy directed Defendants to cease doing business with it.

The Court finds the statement that "Legacy Manufacturing has also been terminated from our approved list of contract manufacturers for cause" to be substantially true, and therefore not actionable as defamation.  Even if it were not true, however, Legacy failed to establish that Boden made his statement in Exhibit 123 that Legacy was terminated "for cause" either with knowledge that it was false or with reckless disregard for its truth or falsity.  Mr. Boden testified that he did not have any doubts about the truth of the statement he made to Meyer in Exhibit 123, that he believed it to be true, and that he was not aware of any information that suggested to

him that the statement was not true.

**Exhibit 140.**  Exhibit 140 is an e-mail dated November 4, 2003, from Loyer to

Carlos Osada, the buyer for Sam's Club-Mexico in Mexico City.  Legacy has

identified the following language in this e-mail as language it contends is defamatory.

> We are the registered trademark . . . owner.  Legacy is merely one of several
> contract manufacturers that MVM Products used to provide the best possible
> inkjet products to the market.

Legacy's contention that the term "contract manufacturer is defamatory *per se*

is rejected for the reasons stated in the Court's analysis of Exhibits 14, 16, and 123.

Legacy has offered no extrinsic evidence that would show that this language was

understood to have a defamatory meaning, or that its recipient understood it to be

defamatory.  Therefore, the Court finds that Legacy has failed to establish a claim for

libel based on the statement in Exhibit 140 that "Legacy is merely one of several

contract manufacturers that MVM Products used to provide the best possible inkjet

products to the market.

As for the statement in Exhibit 140 that MVM is the registered owner of the

trademark, the Court finds that Legacy has also failed to establish a claim for libel

based on this statement.  Once again, Plaintiff's Exhibit 140 is a communication

made by Mr. Loyer to persons with whom Defendants shared a common interest in

the subject matter, and once again this communications is protected by a qualified

privilege.  Legacy must therefore prove that the alleged statement was made by Mr.

Loyer either with knowledge of its falsity or with reckless disregard for its truth or

falsity.  Legacy cannot meet this burden here because the only other statement in

Exhibit 140 that Legacy has identified as defamatory, that MVM is the registered trademark owner, is true.  The registered trademark had not been formally assigned and Loyer justifiably believed that MVM was still the owner of it.

The plaintiff claims tortious interference with actual and prospective business relations, asserting that the defendants diverted sales to MVM.  That claim is unproven for the reasons already discussed.  The plaintiff also claims an interference with its manufacturing of product using the I Talon semiconductor chip.  The plaintiff, however, failed to prove that both MVM and I Talon's refusal to sell the chip directly to Legacy was unjustified.  The state of the record is that the chip was proprietary to MVM.

The defendants' counterclaims for unfair competition and trademark infringement are subject to the same infirmity as the plaintiff's corresponding claims. Although some sales using the brand were made by Legacy after the cease and desist letter was received by Duke, the uncertainty about the authority to use the trademark, either by an incomplete assignment or by a license, implied or explicit, defeats the claim of infringement and unfair competition.  The defendants also claim a breach of contract, asserting that there was a joint venture or an agreement to split profits from sales of Legacy product.  Here too the record fails to support a finding that such an enforceable contract was made.

Upon the foregoing findings of fact and conclusions of law, it is now

ORDERED that all of the plaintiff's claims for relief in its complaint and all of the counterclaims of the defendants are dismissed with prejudice for failure of proof

32

and it is

FURTHER ORDERED that the plaintiff's claim for sanctions under Fed. R.

Civ. P. 11 is denied and it is

FURTHER ORDERED that the Clerk shall enter judgment of dismissal of the

claims and counterclaims and without the award of costs to either plaintiff or

defendants.

Dated: March 9th, 2006

BY THE COURT:

s/Richard P. Matsch

_____

Richard P. Matsch, Senior District Judge